**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **LOGISTIC DYNAMICS, INC.,** | ) | **CIVIL ACTION NO.: 19-cv-01469** |
| **Plaintiff,** | ) | |
| **v.** | ) | **JURY DEMAND** |
| **BLX, INC., BRICE LUKASKO, and** | ) | |
| **JOSH POLANSKY,** | ) | **JUDGE GEOFFREY CRAWFORD** |
| **Defendants.** | ) | |

**DEFENDANTS' ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT**

Defendants BLX, Inc. ("BLX"), Brice Lukasko ("Lukasko"), and Josh Polansky ("Polansky") (together, "Defendants"), by and through its undersigned counsel, hereby submits their Answer and Counterclaims to Plaintiff Logistic Dynamics, Inc.'s ("Plaintiff" or "LDI") Complaint as follows:

## DEFENDANTS' ANSWER

## PARTIES

1.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 1 of the Complaint and, therefore, deny them.

2.     Defendants admit the allegations set forth in Paragraph 2 of the Complaint.

3.     In response to the allegations set forth in Paragraph 3 of the Complaint, Defendants admit Lukasko is a resident of the State of Texas, but denies that Lukasko resides in Cedar Rapids, Iowa.

4.     Defendants admit the allegations set forth in Paragraph 4 of the Complaint.

## JURISDICTION AND VENUE

5.      Paragraph 5 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 5 of the Complaint.

6.      Paragraph 6 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 6 of the Complaint.

7.      Paragraph 7 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 7 of the Complaint.

8.      Paragraph 8 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 8 of the Complaint.

## FACTUAL BACKGROUND

9.      Defendants deny the allegations set forth in Paragraph 9 of the Complaint, except that Defendants admit Lukasko entered into a business relationship with LDI in or around July, 2014.

10.      Defendants deny the allegations set forth in Paragraph 10 of the Complaint, except that Defendants admit BL Transport is a company organized under the State of Iowa and headquartered in Cedar Rapids, Iowa.

11.      Defendants deny the allegations set forth in Paragraph 11 of the Complaint.

12.      Defendants deny the allegations set forth in Paragraph 12 of the Complaint.

### The Freight Broker Agreement

13.      In response to the allegations set forth in Paragraph 13 of the Complaint, Defendants admit that BLX entered into an agreement with LDI on or around January 1, 2018 and further state that the language of the agreement annexed to Plaintiff's Complaint (the "Agreement") speaks for itself.

14.     In response to the allegations set forth in Paragraph 14 of the Complaint, Defendants state that the language of the Agreement speaks for itself.

15.     Defendants deny the allegations set forth in Paragraph 15 of the Complaint.

16.     In response to the allegations set forth in Paragraph 16 of the Complaint, Defendants state that the language of the Agreement speaks for itself.

17.     In response to the allegations set forth in Paragraph 17 of the Complaint, Defendants state that the language of the Agreement speaks for itself.

<u>**BREACHES OF THE AGREEMENT**</u>
<u>**Fraudulent Invoicing**</u>

18.     Defendants admit the allegations set forth in Paragraph 18 of the Complaint, except that Defendants point out a typo in the effective date of the Agreement, which was December 31, *2018*, not December 31, 2108, as written.

19.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Complaint and, therefore, deny them.

20.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20 of the Complaint and, therefore, deny them.

21.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 21 of the Complaint and, therefore, deny them.

22.     Defendants deny the allegations set forth in Paragraph 22 of the Complaint.

23.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 23 of the Complaint and, therefore, deny them.

24.     Defendants deny the allegations set forth in Paragraph 24 of the Complaint.

25.     Defendants deny the allegations set forth in Paragraph 25 of the Complaint.

**Breaches of the Restrictive Covenants of the Agreement**

26.     Defendants deny the allegations set forth in Paragraph 26 of the Complaint.

27.     Defendants deny the allegations set forth in Paragraph 27 of the Complaint.

28.     Defendants deny the allegations set forth in Paragraph 28 of the Complaint.

29.     Defendants deny the allegations set forth in Paragraph 29 of the Complaint.

30.     Defendants deny the allegations set forth in Paragraph 30 of the Complaint.

31.     In response to the allegations set forth in Paragraph 31 of the Complaint, Defendants state that the language of the Agreement speaks for itself.

32.     Defendants deny the allegations set forth in Paragraph 32 of the Complaint.

33.     Defendants deny the allegations set forth in Paragraph 33 of the Complaint.

34.     Defendants deny the allegations set forth in Paragraph 34 of the Complaint.

35.     Defendants deny the allegations set forth in Paragraph 35 of the Complaint.

36.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 36 of the Complaint and, therefore, deny them.

37.     Defendants deny the allegations set forth in Paragraph 37 of the Complaint.

38.     Defendants deny the allegations set forth in Paragraph 38 of the Complaint.

39.     Defendants deny the allegations set forth in Paragraph 39 of the Complaint.

40.     Defendants deny the allegations set forth in Paragraph 40 of the Complaint.

41.     Defendants deny the allegations set forth in Paragraph 41 of the Complaint.

**FIRST CAUSE OF ACTION**
**(Breach of Contract - Circumventing Credit Limitations)**

42.     In response to the allegations set forth in Paragraph 42 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

43.     In response to the allegations set forth in Paragraph 43 of the Complaint, Defendants state that the language of the Agreement speaks for itself.

44.     Defendants deny the allegations set forth in Paragraph 44 of the Complaint.

45.     In response to the allegations set forth in Paragraph 45 of the Complaint, Defendants state that the language of the Agreement speaks for itself.

46.     In response to the allegations set forth in Paragraph 46 of the Complaint, Defendants state that the language of the Agreement speaks for itself.

47.     Defendants deny the allegations set forth in Paragraph 47 of the Complaint.

48.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 48 of the Complaint and, therefore, deny them.

49.     Paragraph 49 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 49 of the Complaint.

## SECOND CAUSE OF ACTION
### (Breach of Contract - Non-Competition)

50.     In response to the allegations set forth in Paragraph 50 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

51.     In response to the allegations set forth in Paragraph 51 of the Complaint, Defendants state that the language of the Agreement speaks for itself.

52.     Defendants deny the allegations set forth in Paragraph 52 of the Complaint.

53.     Defendants deny the allegations set forth in Paragraph 53 of the Complaint.

54.     Defendants deny the allegations set forth in Paragraph 54 of the Complaint.

55.     Paragraph 55 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 55 of the Complaint.

### THIRD CAUSE OF ACTION
### (Breach of Contract - Non-Solicitation and Non-Disparagement)

56.    In response to the allegations set forth in Paragraph 56 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

57.    In response to the allegations set forth in Paragraph 57 of the Complaint, Defendants state that the language of the Agreement speaks for itself.

58.    Defendants deny the allegations set forth in Paragraph 58 of the Complaint.

59.    Defendants deny the allegations set forth in Paragraph 59 of the Complaint.

60.    Defendants deny the allegations set forth in Paragraph 60 of the Complaint.

61.    Defendants deny the allegations set forth in Paragraph 61 of the Complaint.

62.    Paragraph 62 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 62 of the Complaint.

### FOURTH CAUSE OF ACTION
### (Breach of Contract - Confidential Information)

63.    In response to the allegations set forth in Paragraph 63 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

64.    Defendants deny the allegations set forth in Paragraph 64 of the Complaint.

65.    Defendants deny the allegations set forth in Paragraph 65 of the Complaint.

66.    Defendants deny the allegations set forth in Paragraph 66 of the Complaint.

67.    Paragraph 67 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 67 of the Complaint.

## FIFTH CAUSE OF ACTION
### (Tortious Interference with Business Relations)

68.     In response to the allegations set forth in Paragraph 68 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

69.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 69 of the Complaint and, therefore, deny them.

70.     Defendants deny the allegations set forth in Paragraph 70 of the Complaint.

71.     Defendants deny the allegations set forth in Paragraph 71 of the Complaint.

72.     Defendants deny the allegations set forth in Paragraph 72 of the Complaint.

73.     Paragraph 73 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 73 of the Complaint.

## SIXTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

74.     In response to the allegations set forth in Paragraph 74 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

75.     Defendants deny the allegations set forth in Paragraph 75 of the Complaint.

76.     Defendants deny the allegations set forth in Paragraph 76 of the Complaint.

77.     Defendants deny the allegations set forth in Paragraph 77 of the Complaint.

78.     Defendants deny the allegations set forth in Paragraph 78 of the Complaint.

79.     Paragraph 79 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 79 of the Complaint.

## SEVENTH CAUSE OF ACTION
### (Conversion)

80.     In response to the allegations set forth in Paragraph 80 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

81.     Defendants deny the allegations set forth in Paragraph 81 of the Complaint.

82.     Defendants deny the allegations set forth in Paragraph 82 of the Complaint.

83.     Defendants deny the allegations set forth in Paragraph 83 of the Complaint.

84.     Defendants deny the allegations set forth in Paragraph 84 of the Complaint.

85.     Paragraph 85 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 85 of the Complaint.

## EIGHTH CAUSE OF ACTION
### (Unfair Competition)

86.     In response to the allegations set forth in Paragraph 86 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

87.     Defendants deny the allegations set forth in Paragraph 87 of the Complaint.

88.     Defendants deny the allegations set forth in Paragraph 88 of the Complaint.

89.     Defendants deny the allegations set forth in Paragraph 89 of the Complaint.

90.     Defendants deny the allegations set forth in Paragraph 90 of the Complaint.

91.     Paragraph 91 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 91 of the Complaint.

## NINTH CAUSE OF ACTION
### (Fraud)

92.     In response to the allegations set forth in Paragraph 92 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

93.     Defendants deny the allegations set forth in Paragraph 93 of the Complaint.

94.     Defendants deny the allegations set forth in Paragraph 94 of the Complaint.

95.     Defendants deny the allegations set forth in Paragraph 95 of the Complaint.

96.     Defendants deny the allegations set forth in Paragraph 96 of the Complaint.

97.     Defendants deny the allegations set forth in Paragraph 97 of the Complaint.

98.     Defendants deny the allegations set forth in Paragraph 98 of the Complaint.

99.     Defendants deny the allegations set forth in Paragraph 99 of the Complaint.

100.     Paragraph 100 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 100 of the Complaint.

## TENTH CAUSE OF ACTION
### (Defamation - Count I)

101.     In response to the allegations set forth in Paragraph 101 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

102.     Defendants deny the allegations set forth in Paragraph 102 of the Complaint.

103.     Defendants deny the allegations set forth in Paragraph 103 of the Complaint.

104.     Defendants deny the allegations set forth in Paragraph 104 of the Complaint.

105.     Defendants deny the allegations set forth in Paragraph 105 of the Complaint.

106.     Defendants deny the allegations set forth in Paragraph 106 of the Complaint.

107.     Paragraph 107 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 107 of the Complaint.

## ELEVENTH CAUSE OF ACTION
### (Defamation - Count II)

108.     In response to the allegations set forth in Paragraph 108 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

109.     Defendants deny the allegations set forth in Paragraph 109 of the Complaint.

110.     Defendants deny the allegations set forth in Paragraph 110 of the Complaint.

111.     Defendants deny the allegations set forth in Paragraph 111 of the Complaint.

112.     Defendants deny the allegations set forth in Paragraph 112 of the Complaint.

113.     Paragraph 113 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 113 of the Complaint.

## TWELFTH CAUSE OF ACTION
### (Breach of Implied Contract)

114.     In response to the allegations set forth in Paragraph 114 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

115.     Defendants deny the allegations set forth in Paragraph 115 of the Complaint.

116.     Defendants deny the allegations set forth in Paragraph 116 of the Complaint.

117.     Defendants deny the allegations set forth in Paragraph 117 of the Complaint.

118.     Defendants deny the allegations set forth in Paragraph 118 of the Complaint.

119.     Paragraph 119 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 119 of the Complaint.

## THIRTEENTH CAUSE OF ACTION
### (Quantum Meruit)

120.     In response to the allegations set forth in Paragraph 120 of the Complaint, the Defendants incorporate by reference the responses previously set forth in their Answer as if fully rewritten herein.

121.     Defendants deny the allegations set forth in Paragraph 121 of the Complaint.

122.     Defendants deny the allegations set forth in Paragraph 122 of the Complaint.

123.     Paragraph 123 asserts a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 123 of the Complaint.

124.     Defendants deny any and all allegations of the Complaint that are not expressly admitted herein.

## DEFENDANTS' AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
#### (Failure to State a Claim)

125.     Plaintiff has failed to state a claim upon which relief may be granted against any or all Defendants.

### SECOND AFFIRMATIVE DEFENSE
#### (Lack of Trade Secret)

126.     Plaintiff's purportedly confidential business information does not constitute a "trade secret" under New York or federal law.

### THIRD AFFIRMATIVE DEFENSE
#### (Lack of Personal Jurisdiction)

127.     This Court is without personal jurisdiction over Defendants Lukasko and Polansky.

### FOURTH AFFIRMATIVE DEFENSE
#### (Unclean Hands)

128.     Plaintiff's claims are barred by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE
### (Plaintiff's Breach the Agreement)

129.    Plaintiff's breach of contract claims are barred by virtue of Plaintiff's own breach of the Agreement.

## SIXTH AFFIRMATIVE DEFENSE
### (Merger/Integration Clause)

130.    Plaintiff's breach of implied contract and unjust enrichment claims are barred by the presence of an enforceable merger/integration clause in the Agreement.

## SEVENTH AFFIRMATIVE DEFENSE
### (Parol Evidence Rule)

131.    Plaintiff's breach of implied contract and unjust enrichment claims are barred by the parol evidence rule.

## EIGHTH AFFIRMATIVE DEFENSE
### (Equitable Estoppel)

132.    Plaintiff's claims are barred by the doctrine of equitable estoppel.

## NINTH AFFIRMATIVE DEFENSE
### (Consent)

133.    Plaintiff's breach of contract claims are barred by virtue of Plaintiff's consent to Defendants' circumvention of the credit limitations under the Agreement.

## TENTH AFFIRMATIVE DEFENSE
### (Waiver)

134.    Plaintiff's breach of contract claims are barred by virtue of Plaintiff's waiver of the credit limitation provision under the Agreement.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Ability to Cure)

135.    Plaintiff's breach of contract claims are barred by Plaintiff's failing to allow Defendants an opportunity to cure any breach, as required by the Agreement.

**TWELFTH AFFIRMATIVE DEFENSE**
**(Contravention of Public Policy)**

136.   All or some of Plaintiff's claims are barred by virtue of the fact that enforcement

thereof would violate public policy.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(All Other Affirmative Defenses)**

137.   Plaintiff's claims are barred by additional affirmative defenses that may arise or be

discovered during the course of the litigation.

**DEFENDANT BLX'S COUNTERCLAIMS[1]**

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

**A.**   **The Parties**

138.   Defendant BLX is a corporation incorporated under the laws of Iowa with its

principal place of business in Cedar Rapids, Iowa.

139.   Defendants Lukasko and Polansky are the principals of BLX.

140.   Lukasko resides in Texas.

141.   Polansky resides in Iowa.

142.   Upon information and belief, LDI is a corporation incorporated under the laws of

New York, with its principal place of business in Amherst, New York.

**B.**   **The Freight Broker Agreement**

143.   LDI and BLX entered into an agreement, dated January 1, 2018,[2] in which BLX

became an independent contractor for LDI, engaging in freight brokerage services using certain

services provided by LDI (the "Agreement").

---

[1]Defendants Lukasko and Polansky *do not* assert any counterclaims in this action.

[2]The Agreement annexed as Exhibit A to the Complaint is signed January 1, 2019, but this is a mistake.  It was actually dated January 1, 2018, as all parties appear to agree. *See* Compl. ¶ 13.

144.    A true and correct copy of the Agreement is annexed hereto as **Exhibit 1.**

145.    The full terms of the Agreement speak for themselves.

146.    As part of the arrangement, BLX would arrange shipments with its customers and freight forwarders, and LDI would invoice BLX's customers for the shipments and then pay commissions to BLX for such shipments, or "loads."

147.    Although BLX was an agent for LDI, both LDI and BLX considered that the customers for whom BLX arranged shipments were considered BLX customers, not LDI customers.

148.    As such, other LDI agents did not communicate with or otherwise handle any shipping arrangements with BLX's customers.

149.    In March 2018, BLX purchased the domain name www.shipblx.com and began to use "@shipblx.com" as its email address for communications pursuant to the Agreement.

150.    LDI also made an oral promise to host BLX's proprietary "@shipblx.com" emails and email domain on LDI's server until the time that BLX could get its own server up and running.

151.    This arrangement was not connected to the Agreement or otherwise a contractual obligation, as no consideration was contemplated in exchange for LDI hosting BLX's emails.

152.    The term of the Agreement was for a period of one year with automatic renewal for successive one-year terms, *unless* either LDI or BLX provided written notice of intent not to renew at least sixty days prior to the expiration of the term.  Ex. 1 § 27.

C.    **LDI's Credit Limitations**

153.    Section 6 of the Agreement requires that BLX adhere to LDI's customer credit limitations.  Ex. 1 § 6.

154.    This provision also states that BLX will be responsible for uncollected billing over the customer credit limit and will be assessed a fee proportional to the requisite commission for

amounts expended by LDI in collecting monies owed by a customer in excess of these limitations. *Id.*

155.    In short, Section 6 of the Agreement outlined both the credit limitation requirement *and* the consequences to BLX of violating this requirement.

156.    During the term of the Agreement, BLX needed to create orders, or loads, with customers in excess of those customers' individual credit limitations.

157.    In order to comply with Section 6, BLX asked LDI for permission to exceed the limitations or to otherwise be able to build these loads.

158.    LDI responded by instructing BLX to create "dummy" loads with other customers whose credit exceeded LDI's limitations and to adjust the customer information once the correct customer made the requisite payment.

159.    At LDI's insistence, BLX complied with this request.

160.    BLX did not have any issues with this method of doing business, and LDI did not complain of this conduct, until *after* BLX notified LDI of its non-renewal of the Agreement, as outlined below.

161.    Indeed, BLX always corrected the dummy loads, ensuring that the correct customer was billed properly.

**D.    BLX's Non-Renewal of the Agreement**

162.    Pursuant to the right to terminate, or the right not to renew, the Agreement, BLX notified LDI on or about October 9, 2018 of BLX's intention not to renew the Agreement in its current form.

163.    Attached hereto as **Exhibit 2** is a true and correct copy of BLX's notice of non-renewal (the "Non-Renewal Notice").

164.    In the Non-Renewal Notice, BLX indicated that it would be willing to discuss continuing to work with LDI "pursuant to a different arrangement."  Ex. 2.

165.    However, BLX and LDI were not able to negotiate a new agreement, satisfactory to both parties.

166.    Despite the ultimate expiration of the Agreement on January 1, 2019 and the non-renewal thereof, BLX asked LDI if the parties could extend the terms of the Agreement for three to six months, to allow BLX to smoothly transition to its new business arrangements, and LDI agreed to the request.

167.    On multiple occasions, LDI president Evan Gaskill ("Gaskill") assured Lukasko and Polansky that BLX's proposed extension of the Agreement was acceptable to LDI.

168.    At that time, it appeared to BLX that the parties were terminating their relationship on amicable terms.

**E.**    **LDI Sets up BLX to Breach the Agreement and Improperly Terminates the Agreement Early**

169.    In or around November 2018, LDI's attitude toward BLX began to change.

170.    Despite initially agreeing to extend the terms of the Agreement for three to six months after its expiration, in or around November 2018, LDI reneged on this arrangement.

171.    LDI informed Polansky and/or Lukasko that BLX would need to sign a new agreement, which contained the same terms as the Agreement but for a five-year term, or their relationship would terminate with the expiration of the Agreement.

172.    BLX did not agree to this sudden and inequitable ultimatum.

173.    Following this rejection, LDI began laying the groundwork for fabricating BLX's "breach" of the Agreement.

174. LDI began to significantly reduce its credit limitations of several of BLX's significant customers, forcing BLX to build dummy loads with other customers—which LDI had previously instructed BLX to do—or face losing business with those customers.

175. In the final days of the Agreement, LDI deleted any remaining credit with existing BLX customers.

176. During this time, LDI also suddenly began complaining about BLX billed loads due and owing of more than sixty days.

177. LDI began withholding commissions from BLX, despite the fact that during the entirety of the rest of the relationship, LDI did not strictly enforce the provisions of the Agreement dealing with past due invoices.

178. Despite earlier instructions on the credit limitations, on or about December 18, 2018, Gaskill emailed Lukasko and Polansky accusing BLX of violating the credit limitation provision of the Agreement.

179. In response, however, BLX agreed to correct any customer billing discrepancies.

180. On December 19, *the very next day*, Gaskill asked for a list of all loads with credit limitations that had "been circumvented" and threated to terminate the Agreement.

181. Although BLX complied with this request, LDI notified BLX that it was terminating the Agreement effective December 20, 2018.

182. LDI did so despite the fact that the Agreement was set to expire on January 1, 2019.

**F.**   **Unpaid Commissions**

183. Under the Agreement, LDI was obligated to pay BLX weekly commission payments based on its brokered loads.  Ex. 1 § 5.

184. However, prior to LDI's improper termination of the Agreement, LDI began wrongfully withholding these commissions.

185.     In the weeks following LDI's improper termination of the Agreement, BLX asked that LDI pay BLX any earned and unpaid commissions.

186.     As of the date of filing, LDI owes BLX an amount not less than $868,007.86, plus interest, in unpaid commissions.

187.     Despite repeated demands, LDI has refused to pay this amount.

188.     When confronted, LDI has stated that it is withholding commissions until LDI receives all monies associated with certain loads paid by the respective customers.

189.     However, the Agreement does not permit LDI to withhold commissions for this reason. *See id.* §§ 7, 14.

**G.     LDI's Improper Retention of BLX's Emails**

190.     Since LDI's improper termination of the Agreement, LDI has also impermissibly retained and denied BLX access to BLX's emails.

191.     Prior to the termination of the Agreement, LDI agreed to host BLX's emails and email domain on its server while BLX established its own server.

192.     As a result of this arrangement, LDI had access to BLX's emails, although both LDI and BLX understood that these emails belonged to and were owned by BLX only.

193.     When LDI notified BLX that LDI was (improperly) terminating the Agreement, LDI's president, Evan Gaskill, promised that LDI would allow BLX to continue using its email accounts on the LDI servers until and including December 31, 2018.

194.     Instead, however, LDI cut off BLX's access to all systems, including BLX's own email, on the morning of December 20, 2018.

195.     As a result, BLX scrambled to get a new email system up and running so that it could continue its own business.

196.   Additionally, because BLX lost access to its emails, it was unable to effectively communicate with its own customers or otherwise wrap up its business with LDI in accordance with the Agreement.

197.   BLX requested *on multiple occasions* that LDI return each and every email to BLX.

198.   In May 2019, LDI's counsel provided BLX with a hard drive containing *some* of BLX's numerous emails.

199.   Upon information and belief, LDI has not returned all of BLX's emails.

200.   LDI has also continued to prevent BLX and all of its employees from accessing the BLX emails hosted on LDI's server.

## H.   LDI's Improper Access of BLX's Emails and Misappropriation of BLX's Customer Information

201.   During the time that LDI improperly denied BLX access to its emails, LDI improperly accessed BLX's emails.

202.   LDI's permissible access of BLX's emails and email domain on LDI's server was limited to access that was necessary to host and provide administrative services for BLX's emails and email domain.

203.   Upon information and belief, LDI's president, Evan Gaskill, intentionally accessed the LDI server for purposes of accessing BLX's emails and mining information from BLX's emails and Gaskill obtained, *inter alia*, customer information and contact information, including addresses, contact names, and email addresses, as well as extremely sensitive information regarding services provided, shipping lanes and frequency, rates, profits and methods, and operating procedures.

204.    LDI used the information it improperly obtained from BLX's emails to communicate with BLX's customers in order to solicit their business and to disparage BLX's reputation and destroy the goodwill BLX had with its customers and prospective business partners.

205.    LDI's improper use of BLX's customer and other proprietary information includes, but is not limited to:

a.    LDI's president sending a letter personally addressed to BLX's primary contacts at Team Worldwide;

b.    LDI emailing Omni Logistics, Inc. requesting that communications regarding loads brokered by BLX should be directed to LDI and suggesting that future BLX quote request letters are "not authorized" and should be sent directly to LDI;

c.    LDI's president sending letters personally addressed to all of BLX's contacts at AIT Worldwide Logistics, Inc. ("AIT");

d.    An LDI employee emailing a key contact at AIT stating that BLX may have "sabotaged load details in our system prior to their departure;" and

e.    LDI sending gift baskets and letters via regular mail and email on or about December 18, 2018, to every contact for BLX's largest customers, informing each contact that BLX is no longer an agent of LDI and attempting to persuade these customers to remain with LDI instead of BLX, a few examples of which are attached hereto as **Exhibit 3.**

206.    Mr. Gaskill's access of the LDI server and BLX's emails contained therein exceeded the authority given to LDI's computer administrator to only access BLX's emails for the purpose of hosting and administering BLX's emails.

207.    LDI could only have been able to make these communications through its unauthorized access of BLX's emails on the LDI server.

208.    As a result of LDI's conduct, BLX saw a substantial decline in its revenues in the months immediately after LDI's improper communications to BLX's customers and prospective business partners.

209.    In particular, when LDI improperly reached out to BLX customers and sought to keep those customers with LDI, LDI offered significant rate discounts, ultimately forcing BLX to reduce its rates to keep its own clients and reducing BLX's revenue.

210.    Upon information and belief, LDI also sent emails using BLX's email domain, some of which have also not been returned to BLX.

## I.      LDI's Disparagement of BLX and Tortious Interference

211.    In addition to improperly using BLX's customer information to solicit business, LDI also intentionally interfered with BLX's business relationships.

### *AIT Worldwide Logistics, Inc.*

212.    LDI intentionally and improperly interfered with BLX's relationship with AIT.

213.    LDI's president sent letters personally addressed to all of BLX's contacts at AIT informing them that LDI has severed ties with BLX.

214.    Additionally, an LDI employee emailed a key contact at AIT stating that BLX may have "sabotaged load details in our system prior to their departure."

215.    Despite BLX's longstanding and good relationship with AIT, as result of these communications, AIT refused to continue to do business with BLX.

216.    In short, BLX lost one of its largest customers, which comprised roughly one-third to one-half of BLX's total business.

### GlobalTranz

217.    Prior to LDI's termination, BLX had anticipated becoming its own transportation brokerage company, rather than as an agent for an existing company.

218.    However, this plan changed when LDI suddenly and improperly terminated the Agreement, leaving BLX without access to any of its accounts and scrambling to continue serving its clients.

219.    As a result of LDI's termination, BLX rapidly began negotiations to enter into a new agency agreement with GlobalTranz ("GTZ") to provide services similar to those previously provided by LDI.

220.    Upon information and belief, GTZ was eager to partner with BLX and welcomed BLX with open arms.

221.    At this time, GTZ was also considering acquiring BLX.

222.    LDI was aware that BLX was in discussions with GTZ regarding a potential new partnership.

223.    On December 27, 2018, Benjamin D. Burge ("Burge"), counsel to LDI, sent a letter to BLX on behalf of LDI in which he made numerous allegations against BLX regarding "billing discrepancies" and suggested that BLX was improperly using LDI's information for its own benefit or otherwise violating covenants contained in the January 1, 2018 Agreement.

224.    A true and correct copy of this letter is attached hereto as **Exhibit 4.**

225.    Burge, on behalf, of LDI, sent a copy of this letter via first class mail to the general counsel for GTZ, with whom BLX was in negotiations to enter into a new partnership. *See* Ex. 4 at 2.

226.    There was no legitimate reason for LDI to send this letter to counsel for GTZ.

227.    As a result, key executives and officers of GTZ immediately contacted BLX, reporting rumors that BLX had been deceptive and unethical in its transition from LDI and began questioning BLX's intentions in partnering with GTZ.

228.    Lukasko attempted to clear up any misunderstandings GTZ had about BLX and reassure any newfound reservations GTZ had about partnering with BLX.

229.    However, LDI's communications had already resulted in reputational harm to BLX.

230.    GTZ ceased any discussions of acquiring BLX and this new business relationship was now off to a rocky start.

231.    BLX has had to expend efforts to repair the previously exemplary relationship that it had with GTZ.

### *Team Worldwide*

232.    LDI also intentionally interfered with BLX's relationship with Team Worldwide.

233.    Team Worldwide was and is one of BLX's most significant customers.

234.    Upon information and belief, LDI reached out to a corporate executive at Team Worldwide and communicated that BLX was not to be trusted and was operating illegally.

235.    As a result, BLX temporarily lost some of its business with Team Worldwide.

236.    BLX is continuing to work to regain Team Worldwide's trust and business.

237.    This same type of interference occurred with several other customers of BLX.

**J.**    **Procedural History**

238.    On March 1, 2019, BLX filed suit against LDI in the U.S. District Court for the Northern District of Iowa, captioned *BLX, Inc. v. Logistic Dynamics, Inc.*, Index No. 1:19-cv-25-MAR.

239.     BLX brought causes of action for misappropriation of trade secrets, tortious interference, defamation, breach of oral contract, and violations of the Stored Communications Act and sought monetary damages and injunctive relief.

240.     LDI moved to dismiss or to change venue, citing to Section 28 of the Agreement.

241.     On October 8, 2019, the Northern District of Iowa granted LDI's motion and dismissed the case.

242.     On October 31, 2019, LDI filed this action against BLX, Polansky, and Lukasko.

### CAUSES OF ACTION

### COUNT I
### Breach of Contract - Improper Termination

243.     BLX repeats and realleges Paragraphs 1 through 242 as though fully set forth herein.

244.     On or about January 1, 2018, BLX and LDI entered into the Agreement, which provided that BLX would provide freight brokerage services as agent for LDI, in exchange for payment of commissions based on BLX arranged loads.  *See* Ex. 1.

245.     The term of the Agreement was one year from the date of the Agreement with automatic renewal, unless either party notified an intent not to renew sixty days before expiration of the term.  Ex. 1 § 27.

246.     BLX notified LDI on or about October 9, 2018 of BLX's intention not to renew the Agreement in its current form. Ex. 2.

247.     The parties did not reach a new agreement to continue their business relationship, and as a result, the Agreement was to expire on January 1, 2019.

248.     However, on or about December 19, 2018, LDI notified BLX that it was terminating the Agreement effective December 20, 2018.

249.    LDI claimed it terminated the Agreement because BLX had breached the customer credit limitation provision of the Agreement.

250.    However, Agreement does not permit LDI to terminate the Agreement for a violation of the customer credit limitations provision.  Ex. 1 § 6.

251.    Additionally, LDI had waived the customer credit limitations or otherwise explicitly allowed BLX to circumvent the customer credit limitations.

252.    Therefore, LDI had no right to terminate the Agreement prior to the expiration of the term, and LDI's notice that it was terminating the Agreement, effective December 20, 2018 was a material breach of the Agreement.

253.    As a result of LDI's breach, BLX was damaged.

254.    Immediately following LDI's termination, BLX scrambled to continue to serve its clients.

255.    This resulted in an unnecessarily hurried contractual arrangement and operational transition by BLX to GTZ.

256.    Because GTZ was a large company, it took time to run conflicts and otherwise transition BLX's customers to GTZ's system, which inevitably led to reduced revenue for BLX in the weeks and months that followed.

257.    Additionally, because LDI terminated so abruptly and cut off BLX's email access, many of BLX's customers were upset with BLX and apprehensive about continuing business with BLX.

258.    BLX has had to devote significant efforts to regaining the trust of its customers.

259.    As a result of LDI's improper termination of the Agreement, BLX has suffered damages in an amount to be determined at trial.

## COUNT II
## Breach of Contract - Withholding of Commissions

260.    BLX repeats and realleges Paragraphs 1 through 259 as though fully set forth herein.

261.    On or about January 1, 2018, BLX and LDI entered into the Agreement, which provided that BLX would provide freight brokerage services as agent for LDI, in exchange for payment of commissions based on BLX arranged loads. *See* Ex. 1.

262.    Under the Agreement, LDI was obligated to pay BLX these commissions on a weekly basis based on BLX's brokered loads. *Id.* § 5.

263.    At the time of LDI's improper termination of the Agreement, LDI owed BLX commissions on several loads.

264.    As of the date of filing, LDI owes BLX approximately $868,007.86 in unpaid commissions.

265.    Despite repeated demands, LDI has refused to pay this amount.

266.    When confronted, LDI has stated that it is withholding commissions until all monies associated with certain loads have been fully paid by respective customers.

267.    The Agreement does not permit LDI to withhold commissions for this reason. *See id.* §§ 7, 14.

268.    Thus, LDI's refusal to pay BLX its earned commissions is a material breach of the Agreement.

269.    As a result of LDI's improper withholding of commissions, BLX has suffered damages in an amount to be determined at trial, but not less than $868,007.86, plus pre and post-judgment interest to the maximum allowed under the requisite law.

## COUNT III
## Conversion

270.   BLX repeats and realleges Paragraphs 1 through 269 as though fully set forth herein.

271.   LDI hosted BLX's proprietary "@shipblx.com" emails and email domain on LDI's server.

272.   LDI promised to host BLX's emails and email domain until the time that BLX could get its own server up and running.

273.   As a result of this arrangement, LDI had access to BLX's emails, although both LDI and BLX understood that these emails belonged to and were owned by BLX only.

274.   After improperly terminating the Agreement, LDI cut off BLX's access to all systems, including BLX's own email, on the morning of December 20, 2018.

275.   LDI had and continues to have exclusive access to BLX's emails, to the exclusion of BLX.

276.   BLX has requested *on multiple occasions* that LDI return each and every email to BLX.

277.   In May 2019, LDI's counsel provided BLX with a hard drive containing *some* of BLX's numerous emails.

278.   However, LDI has not returned all of BLX's emails.

279.   LDI has also continued to prevent BLX and all of its employees from accessing the BLX emails hosted on LDI's server.

280.   As a result of LDI's sudden termination of BLX's access to its emails and domain, BLX scrambled to get a new email system up and running so that it could continue its own business.

281.    Additionally, because BLX lost access to its emails, it was unable to effectively communicate with its own customers or otherwise wrap up its business with LDI in accordance with the Agreement.

282.    This caused many of BLX's customers to become upset with BLX and apprehensive about continuing business with BLX.

283.    BLX has had to devote significant efforts to regaining the trust and business of many of its clients.

284.    As a result of LDI's conversion of BLX's email and domain, BLX has suffered damages in an amount to be determined at trial.

285.    Additionally, LDI's conduct, as set forth herein, if allowed to continue, will cause irreparable harm to BLX for which monetary damages alone are an inadequate remedy.

286.    Thus, BLX is also entitled to permanent injunctive relief in the form of an order requiring LDI to return BLX's emails, which it has wrongfully withheld, and requiring LDI to destroy any digital or hard copies of BLX's emails that it has on its servers.

## COUNT IV
## Stored Communications Act

287.    BLX repeats and realleges Paragraphs 1 through 286 as though fully set forth herein.

288.    Under the Stored Communications Act, 18 U.S.C. § 2701, *et. seq.* ("SCA"), it is unlawful to "intentionally access[] without authorization a facility through which an electronic communication service is provided" or "intentionally exceed[] an authorization to access that facility."

289.    BLX purchased its own email domain name, "@shipblox.com."

290.    LDI agreed to host BLX's emails through its "@shipblx.com" domain name on LDI's servers and for LDI to provide administration services with respect to BLX's separate domain name.

291.    LDI's servers are a "facility through which an electronic communication service is provided" for purposes of the SCA.

292.    By hosting BLX's emails and email domain on LDI's server, LDI is a provider of electronic communications services for purposes of the SCA.

293.    Both LDI and BLX acknowledged that the emails and email domain belonged to BLX only.

294.    LDI's permissible access of BLX's emails and email domain was limited only to access necessary to host and provide administrative services for BLX's emails and email domain.

295.    On or around December 21, 2018, LDI intentionally accessed the server for purposes of reading BLX's emails stored on LDI's server and mining information from BLX's emails and obtained, *inter alia*, customer information and contact information, including addresses, contact names, and email addresses, as well as extremely sensitive information regarding services provided, shipping lanes and frequency, rates, profits and methods, and operating procedures.

296.    LDI's access of the server and BLX's emails contained therein exceeded the authority given to LDI's computer administrator to only access BLX's emails for the purpose of hosting and administering BLX's emails.

297.    LDI has also prevented BLX and all of its employees from accessing the BLX emails hosted on LDI's server, and continues to prevent that access.

298.    LDI's access in excess of its authority allowed LDI to improperly obtain information contained in BLX's emails to which it was not authorized to possess or read.

299.    LDI improperly and without authorization used the information that it wrongfully obtained to communicate with BLX's customers, steal BLX's customers, and send defamatory information about BLX to BLX's customers.

300.    LDI's improper access was willful, intentional, and malicious.

301.    Thus, LDI improperly and without authorization accessed BLX's emails for the purpose of commercial advantage, malicious destruction or damage, private commercial gain, and/or in furtherance of committing tortious acts of interference with business relationships, unfair competition, and misappropriation of trade secrets.

302.    As a result of LDI's conduct, BLX has been and continues to be damaged by LDI's conduct, specifically suffering damage to BLX's reputation and the loss of BLX's customers.

303.    As such, BLX seeks actual damages in an amount to be determined at trial, statutory damages of $1,000 per violation, punitive damages, costs, attorney's fees, and preliminary and permanent injunctive relief.

## COUNT V
## Tortious Interference

304.    BLX repeats and realleges Paragraphs 1 through 303 as though fully set forth herein.

305.    Plaintiff BLX had existing relationships and prospective business advantage with customers and potential business partners AIT, Teamworldwide, and GTZ.

306.    LDI had knowledge of these existing and prospective contractual relationships, and has engaged in intentional acts intended or designed to disrupt and/or prevent such contracts and prospective contractual relationships.

307.    LDI intentionally and improperly interfered with these relationships by sending untrue and disparaging communications regarding BLX to AIT, GTZ, and Teamworldwide, as well as other BLX's customers.

308.    Upon information and belief, LDI reached out to a corporate executive at Team Worldwide, and communicated that BLX was not to be trusted and operating illegally.

309.    Following improper termination of the Agreement, LDI, through its counsel, sent the general counsel of GTZ, a copy of a letter addressed to BLX in which LDI's counsel Benjamin Burge made numerous allegations against BLX regarding "billing discrepancies" and suggested that BLX was improperly using LDI's information for its own benefit or otherwise violating the Agreement. *See* Ex. 4 at 2.

310.    LDI knew that BLX was in negotiations to enter into a new partnership with GTZ.

311.    There was no legitimate reason for LDI to send this letter to counsel for GTZ.

312.    Additionally, LDI's president sent letters personally addressed to all of BLX's contacts at AIT informing them that LDI has severed ties with BLX.

313.    Also, an LDI employee emailed a key contact at AIT stating that BLX may have "sabotaged load details in our system prior to their departure."

314.    LDI's conduct was malicious and intentional, for the sole purpose of harming BLX's business.

315.    Furthermore, LDI's conduct was accomplished, in whole or in part, through the misappropriation of BLX's confidential and proprietary information and trade secrets.

316.    LDI's intentional acts interfered with and disrupted BLX's contractual relationships and/or prevented BLX from forming contracts and prospective contractual relationships.

317.    As a result of LDI's conduct, BLX has suffered damages.

318.    Despite BLX's longstanding and good relationship with AIT, as result of these communications, AIT refused to continue to do business with BLX.

319.    In short, BLX lost one of its largest customers, which comprised approximately one-half to one-third of BLX's business.

320.    With respect to GTZ, as a result of LDI's conduct, the initial warm and amicable relationship BLX had with GTZ was replaced with one filled with reservations and suspicions.

321.    BLX has had to expend energies to restore trust with GTZ.

322.    With respect to Team Worldwide, as a result of LDI's conduct, Team Worldwide temporarily halted business with BLX.

323.    BLX is continuing to work to regain Team Worldwide's trust and business.

324.    This same thing happened with several other customers.

325.    BLX has suffered and/or will suffer irreparable and other injury—including, but not limited to, loss of goodwill and customer relationships, lost profits, and money damages—as a direct and proximate result of LDI's wrongful interference with BLX's business relationships.

326.    BLX is further threatened with ongoing dissipation of its confidential and proprietary information, loss of customers, and damage to its reputation and goodwill unless LDI is enjoined from committing wrongful interference with BLX's business relationships.

327.    As such, BLX seeks monetary damages for LDI's tortious interference in an amount to be determined at trial.

328.    Additionally, LDI's conduct, as set forth herein, if allowed to continue, will cause irreparable harm to BLX for which monetary damages alone are an inadequate remedy.

329.    Thus, BLX is also entitled to permanent injunctive relief in the form of an order enjoining LDI from further interfering with BLX's relationships with its customers and prospective business partners.

### COUNT VI
### Unfair Competition

330.    BLX repeats and realleges Paragraphs 1 through 329 as though fully set forth herein.

331.    LDI agreed to host BLX's emails through its "@shipblx.com" domain name on LDI's servers and for LDI to provide administration services with respect to BLX's separate domain name.

332.    As a result of this relationship, LDI had access to BLX's emails and email domain, but both LDI and BLX acknowledged that the emails and email domain belonged to BLX only.

333.    As such, LDI's permissible access of BLX's emails and email domain was limited to only that access necessary to host and provide administrative services for BLX's emails and email domain.

334.    On or around December 20, 2018, LDI cut off BLX's access to its email, preventing BLX and all of its employees from accessing the BLX emails hosted on LDI's server, and continues to prevent that access.

335.    On or around December 21, 2018, LDI intentionally accessed the server for purposes of reading BLX's emails stored on LDI's server and mining information from BLX's emails and obtained, inter *alia*, customer information and contact information, including addresses, contact names, and email addresses, as well as extremely sensitive information regarding services provided, shipping lanes and frequency, rates, profits and methods, and operating procedures.

336.    LDI's access of the server and BLX's emails contained therein exceeded the authority given to LDI's computer administrator to only access BLX's emails for the purpose of hosting and administering BLX's emails.

337.    LDI's improper access allowed LDI to improperly obtain information contained in BLX's emails to which it was not authorized to possess or read.

338.    LDI improperly and without authorization used the information that it wrongfully obtained to communicate with BLX's customers, steal BLX's customers, and send defamatory information about BLX to BLX's customers.

339.    LDI's improper use of BLX's customer and other proprietary information includes, but is not limited to:

> a.    LDI's president sending a letter personally addressed to BLX's primary contacts at Team Worldwide,
>
> b.    LDI emailing Omni Logistics, Inc. requesting that communications regarding loads brokered by BLX should be directed to LDI and suggesting that future BLX quote request letters are "not authorized" and should be sent directly to LDI,
>
> c.    LDI's president sending letters personally addressed to all of BLX's contacts at AIT;
>
> d.    An LDI employee emailing to a key contact at AIT stating that BLX may have "sabotaged load details in our system prior to their departure,"
>
> e.    LDI sending gift baskets and letters via regular mail and email on or about December 18, 2018, to every contact for BLX's largest customers, informing each contact that BLX is no longer an agent of LDI and

attempting to persuade these customers to remain with LDI instead of BLX, *See* Ex. 3.

340.    LDI could only have been able to make these communications through its unauthorized access of BLX's emails on the LDI server.

341.    BLX's emails and domain contained not simply a list of BLX customers, but also the names and contact information for employees of BLX customers that made decisions about which freight brokers to use.

342.    BLX expended a great amount of time and effort in compiling and organizing this information.

343.    This information is also not publicly available, and BLX expended efforts to keep this information confidential.

344.    In particular, this information was not readily shared with third parties, and BLX limited access to such confidential information to only those individuals necessary for business purposes.

345.    Without accessing BLX's emails, LDI would not have otherwise been able to learn of this confidential information.

346.    As a result of LDI's conduct, BLX saw a substantial decline in its revenues in the months immediately after LDI's improper communications.

347.    In particular, when LDI improperly reached out to BLX customers and sought to keep those customers with LDI, LDI offered significant rate discounts, which forced BLX to offer a lower rate to keep those customers, thereby reducing BLX's revenue.

348.    In short, LDI misappropriated BLX's labor, skills, and goodwill for the sole purpose of harming BLX's business and advancing LDI's own business interests and damaging BLX in an amount to be determined at trial.

349.    Additionally, LDI's conduct, as set forth herein, if allowed to continue, will cause irreparable harm to BLX for which monetary damages alone are an inadequate remedy.

350.    Thus, BLX is also entitled to permanent injunctive relief in the form of an order enjoining LDI from further utilizing BLX's trade secrets or other confidential customer information.

**COUNT VII**
**Misappropriation of Trade Secrets - Federal Law**
***(Alternative to Unfair Competition)***

351.    BLX repeats and realleges Paragraphs 1 through 350 as though fully set forth herein.

351.    BLX's emails and domain, which were hosted on LDI's servers, contained not simply a list of BLX customers, but also the names and contact information for employees of BLX customers that made decisions about which freight brokers to use.

352.    BLX expended a great amount of time and effort in compiling and organizing this information.

353.    This information is also not publicly available, and BLX expended efforts to keep this information confidential.

354.    In particular, this information was not readily shared with third parties, and BLX limited access to such confidential information to only those individuals necessary for business purposes.

355.    Without accessing BLX's emails, anyone other than BLX would not have otherwise been able to obtain this confidential information.

356.    This information is extremely valuable and useful to BLX, and use by any of its competitors would be harmful to BLX's business.

357.    As such, BLX's customer information constitute a trade secret under the Defend Trade Secrets Act, 18 U.S.C. § 1832 ("DTSA").

358.    By virtue of hosting BLX's emails and email domain, however, LDI had the ability to access to certain confidential information of BLX, including the above-described trade secrets.

359.    Indeed, LDI did access BLX's email and its above-described trade secrets.

360.    LDI's access of the server and BLX's emails contained therein exceeded the authority given to LDI's computer administrator to only access BLX's emails for the purpose of hosting and administering BLX's emails.

361.    LDI impermissibly utilized its access and knowledge of BLX's trade secrets to contact and solicit customers of BLX and to disparage BLX to its customers and prospective business partners.

362.    Thus, LDI's actions constitute misappropriation of BLX's trade secrets under the DTSA.

363.    Further, LDI's actions constitute willful and malicious misappropriation under the DTSA.

364.    BLX has suffered both monetary and reputation damages as a result of LDI's actions in misappropriating BLX's trade secrets to contact and solicit customers of BLX and to disparage BLX to its customers and potential business partners.

365.    Accordingly, BLX seeks damages in an amount to be determined at trial, including treble damages and attorneys' fees, pursuant to the DTSA.

366.     Additionally, LDI's conduct, as set forth herein, if allowed to continue, will cause irreparable harm to BLX for which monetary damages alone are an inadequate remedy.

367.     Thus, BLX is also entitled to permanent injunctive relief in the form of an order enjoining LDI from further utilizing BLX's trade secrets or other confidential customer information.

## COUNT VIII
## Misappropriation of Trade Secrets - New York Law
### (Alternative to Unfair Competition)

368.     BLX repeats and realleges Paragraphs 1 through 367 as though fully set forth herein.

369.     BLX's emails and domain, which were hosted on LDI's servers, contained not simply a list of BLX customers, but also the names and contact information for employees of BLX customers who made decisions about which freight brokers to use.

370.     BLX expended a great amount of time and effort in compiling and organizing this information.

371.     This information is also not publicly available, and BLX expended efforts to keep this information confidential.

372.     In particular, this information was not readily shared with third parties, and BLX limited access to such confidential information to only those individuals necessary for business purposes.

373.     Without accessing BLX's emails, anyone other than BLX would not have otherwise been able to obtain this confidential information.

374.     This information is extremely valuable and useful to BLX, and use by any of its competitors would be harmful to BLX's business.

375.    As such, BLX's customer information constitute a trade secret under New York common law.

376.    By virtue of hosting BLX's emails and email domain, however, LDI had the ability to access certain confidential information of BLX, including the above-described trade secrets.

377.    Indeed, LDI did access BLX's email and its above-described trade secrets.

378.    LDI's access of the server and BLX's emails contained therein exceeded the authority given to LDI's computer administrator to only access BLX's emails for the purpose of hosting and administering BLX's emails.

379.    LDI impermissibly utilized its access and knowledge of BLX's trade secrets to contact and solicit customers of BLX and to disparage BLX to its customers and prospective business partners.

381.    Thus, LDI's actions constitute misappropriation of BLX's trade secrets under New York law.

382.    Further, LDI's actions constitute willful and malicious misappropriation.

383.    BLX has suffered both monetary and reputation damages as a result of LDI's actions in misappropriating BLX's trade secrets and using them to contact and solicit customers of BLX and to disparage BLX to its customers and potential business partners.

384.    Accordingly, BLX seeks damages in an amount to be determined at trial, including both compensatory and punitive damages.

385.    Additionally, LDI's conduct, as set forth herein, if allowed to continue, will cause irreparable harm to BLX for which monetary damages alone are an inadequate remedy.

386.     Thus, BLX is also entitled to permanent injunctive relief in the form of an order enjoining LDI from further utilizing BLX's trade secrets or other confidential customer information.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants request this Court enter judgment in its favor and against LDI as follows:

A.     Dismissing the entirety of LDI's complaint as against all Defendants;

B.     Awarding compensatory and punitive damages in an amount to be determined at trial on BLX's First Counterclaim;

C.     Awarding compensatory and punitive damages in an amount to be determined at trial, but not less than $868,007.86, plus interest, on BLX's Second Counterclaim.

D.     Awarding compensatory and punitive damages in an amount to be determined at trial on BLX's Third Counterclaim;

E.     Issuing a permanent injunction ordering LDI, along with its respective agents, employers, employees, and all other persons acting in concert or participation with them, to return each and every one of BLX's emails and destroy any digital or hard copies of BLX's emails that it has on its servers on BLX's Third Counterclaim;

F.     Awarding compensatory and punitive damages in an amount to be determined at trial on BLX's Fourth Counterclaim;

G.     Awarding statutory damages of $1,000 per violation on BLX's Fourth Counterclaim;

H.     Awarding costs and attorney's fees on BLX's Fourth Counterclaim;

I.     Issuing a permanent injunction ordering LDI, along with its respective agents, employers, employees, and all other persons acting in concert or participation with

them, to return each and every one of BLX's emails and destroy any digital or hard copies of BLX's emails that it has on its servers on BLX's Fourth Counterclaim.

J.      Awarding compensatory and punitive damages in an amount to be determined at trial on BLX's Fifth Counterclaim;

K.      Issuing a permanent injunction enjoining LDI, along with its respective agents, employers, employees, and all other persons acting in concert or participation with them, from further interfering with BLX's relationships with its customers and prospective business partners on BLX's Fifth Counterclaim;

L.      Awarding compensatory and punitive damages in an amount to be determined at trial on BLX's Sixth Counterclaim;

M.      Issuing a permanent injunction enjoining LDI, along with its respective agents, employers, employees, and all other persons acting in concert or participation with them, from further utilizing BLX's trade secrets or other confidential customer information on BLX's Sixth Counterclaim;

N.      Awarding compensatory and punitive damages in an amount to be determined at trial on BLX's Seventh Counterclaim;

O.      Issuing a permanent injunction enjoining LDI, along with its respective agents, employers, employees, and all other persons acting in concert or participation with them, from further utilizing BLX's trade secrets or other confidential customer information on BLX's Seventh Counterclaim;

P.      Awarding compensatory and punitive damages in an amount to be determined at trial on BLX's Eighth Counterclaim;

Q.     Issuing a permanent injunction enjoining LDI, along with its respective agents, employers, employees, and all other persons acting in concert or participation with them, from further utilizing BLX's trade secrets or other confidential customer information on BLX's Eighth Counterclaim;

R.     Awarding costs and reasonable attorney's fees on all of BLX's Counterclaims, where authorized by law or otherwise appropriate; and

S.     All such other relief as this Court deems just and proper.

## JURY DEMAND

Defendants request a jury trial on all issues triable by a jury.

Dated: January 13, 2020                          Respectfully Submitted,


                                                 /s/ Deana S. Stein
                                                 Deana S. Stein
                                                 Eric L. Zalud

                                                 (*pro hac vice admission pending*)
                                                 **BENESCH, FRIEDLANDER, COPLAN
                                                 & ARONOFF LLP**
                                                 200 Public Square, Suite 2300
                                                 Cleveland, OH 44114
                                                 (216) 363-4500
                                                 dstein@beneschlaw.com
                                                 ezalud@beneschlaw.com
                                                 *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day via transmission of Notice of Electronic Filing generated by CM/ECF on the following:

**RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
Benjamin D. Burge
James R. O'Connor
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
(716) 854-3400
burge@ruppbaase.com
oconnor@ruppbaase.com
*Attorneys for LDI Logistic Dynamics, Inc.*

*/s/ Deana S. Stein*
Deana S. Stein
*Counsel for Defendants*

44